UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

Michael Anderson Balentine,
    Plaintiff,
v.

Nick Anzalone, Patrick Fountain, Mr. Brown,
Mr. Bennett, J. Deusler, F. Reynolds,
Mr. Fenton, and Mr. Stockton,
In Their Individual Capacities,
    Defendants.

FIRST AMENDED COMPLAINT

Civil Action #9:22-CV-01383 (LEK/CFH)

JURY DEMAND = YES

## I. Complaint

1. Plaintiff, Michael Balentine, Pro Se, for his first amended complaint states as follows:

## II. Parties, Jurisdiction, and Venue

2. I am the Plaintiff, Michael Balentine, and I was confined at the Marcy Correctional Facility ("CF"), a medium security state prison located at 9000 Old River Road in the City of Marcy and State of New York from January, 2021, until May, 2021. I am presently incarcerated at Collins CF located at P.O. Box 340, Collins, New York, 14034-0340. Throughout this Complaint and subsequent papers, I will refer to myself in the first person instead of using the word "Plaintiff" for the sake of simplicity.

3. I am, and was at all relevant times herein an adult citizen of the United States and of New York State.

4. Defendants Nick Anzalone, Fenton, and Stockton were at all relevant times herein Correctional Officers at Marcy CF. Anzalone was a rover officer. Fenton was a housing unit officer assigned to F2. Stockton was a housing unit officer assigned to D1.

5. Defendants Bennett and Fountain were at all relevant times herein Correctional Housing Unit Sergeants at Marcy CF. No housing unit movement between dorms or cell blocks at Marcy CF could occur without the direct knowledge and expressed consent of one or both of these individuals. Aside from overnight hours between 11pm and 6am, one or both of them was on duty at all times.

6. Defendants Brown, J. Deusler, and F. Reynolds were at all relevant times herein Correctional Sergeants at Marcy CF.

7. Anzalone, Brown, Reynolds, and Deusler are closely associated and have ongoing personal friendships with each other. They are actively engaged in each other's personal and professional lives both inside and outside of the work environment. They share political and religious beliefs, social backgrounds, mannerisms, linguistic patterns, and they have a violent hatred of sex offenders and LGBTQi+ people. Any interaction with one is considered and interpreted by their group as an interaction with all of them in the same manner as a clique or gang.

8. This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy deprivations, under color of state law, of rights guaranteed by the United States Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331.

9. My claims for relief are authorized by 28 U.S.C. §§ 2283 and 2284, and by Rule 65 of the Federal Rules of Civil Procedure.

10. This Cause of Action arose in the Northern District of New York and as such, venue is proper under 28 U.S.C. §1391(b).

11. This Court has Supplemental Jurisdiction over New York State Tort Law claims pursuant to the relevant sections of 42 and 28 U.S.C.

### III. Previous Lawsuits

12. I have filed no other lawsuits dealing with the same facts involved in this action.

### IV. Exhaustion of Administrative Remedies

13. According to Department of Corrections and Community Supervision ("DOCCS") Directive 4040, I timely filed a Grievance regarding the events complained of herein. I appealed to the Central Office Review Committee ("CORC") who denied said grievance by failing to render a determination after 30 days of being in possession of it. A copy of the Grievance and Appeal was attached as an exhibit to the original complaint in the instant matter. I also filed a report with the Office of Special Investigations ("OSI") which is tantamount to filing a Grievance. Since the determination of an OSI investigation has no appeal process, that administrative remedy must also be considered exhausted for purposes of the Prison Litigation Reform Act ("PLRA").

### V. Statement of Claim

14. I reallege and reincorporate by reference paragraphs 1 through 13 herein, as well as all papers that I sent to this Court with the original complaint.

15. At all relevant times herein, Defendants were "persons" for purposes of 42 U.S.C. §1983 and acted under color of law to deprive me of my Constitutional Rights, as well as acting in violation of New York State Tort Law to injure me and to attempt to injure me, as set forth more fully below.

### Statement of Facts

16. On or about the first part of January, 2021, I was transferred from Five Points CF to Marcy CF and assigned to the J1 Reception Dorm Housing Unit ("J1").

17. On or about January 27, 2021, I was called to the Marcy Package Room where Defendant Anzalone called me a "faggot" and threatened that "[I] better hope [he] doesn't see [me] out there."

18. Immediately upon returning to J1, I called OSI via the incarcerated individual ("i/i") phone system to report Anzalone's sexual harassment and threat of violence against me. I did not know his name at that time and I identified him by description.

19. On or about January 28, 2021, I was reassigned to D1. Immediately upon entering D1, I was approached by i/i Jonny Reed, an active member of the Bloods Gang. He informed me that because I was a "Rapo," I would be required to do dishes and cleaning work for the gang and that if I refused, I would be assaulted.

20. On or about February 3, 2021, I was interviewed by Sergeant Gage who advised me that he had been assigned by OSI to investigate my complaint and had spoken with the officer I described in said report. He stated that "some things were said [by Anzalone] that probly shouldn'tah been said" but as long as Anzalone had not done anything further to me, the case would be closed. I agreed with his disposition because Anzalone had not at that point harassed or threatened me

-2-

further.

21. On or about February 6, 2021, I was assaulted and beaten by i/i's Reed, and fellow Blood member Maalique Milord, because I had refused to do their dishes and other cleaning chores as an ongoing rite of enslavement as penance for being a sex offender - or, a "Rapo" in their words.

22. Immediately following that assault, I advised the dorm officer that I had been attacked and needed to be moved off of that unit. He called an emergency, and several security officers led by Defendant Deusler arrived at D1 and escorted me to the infirmary by van. During this transport, the officers in the van verbally assaulted me by calling me a "nasty Rapo" and telling me that they, too, would have forced me to do their dishes. At some point very shortly thereafter, Deusler shared the details of the incident with his group of friends as described in ¶7 above.

23. When I arrived at the infirmary, Defendant Reynolds was present. He ordered me to go into an examination room and strip down to my boxers. He photographed my injuries and then left the room, calling out "Hey Nick! We got your Friend up here!" (It is of critical importance to note that this is the reason I used the name "Nick Doe" in the original complaint. Reynolds making that comment was the reason I knew his first name.) Defendant Anzalone then entered the room and exclaimed to me, "Hi, Friend! It's probly not a good idea to tell on staff, now is it?!" I replied to him that I was scared of him, and he stated that "[I] should be." He made a quick, false movement to make me think he was going to hit me. I flinched, then he laughed and left the room.

24. Immediately thereafter, I was assigned back to J1.

25. On or about February 10, 2021, I attended a disciplinary hearing. I explained to the disciplinary lieutenant the events that occurred prior to and during the attack on me in D1, as well as the fact that I am prone to being harassed, assaulted, bullied, beaten, and extorted by other i/i's due to my charge of conviction, appearance, age, failing health, and Pansexual orientation. He advised me that he would order a Hold on me in J1 for my safety.

26. On or about February 27, 2021, I was reassigned to H2 despite the aforementioned Hold order.

27. On two occasions between February 27 and March 11, 2021, Defendant Brown entered H2 on the evening shift and observed me cleaning the bathroom area. Both times, he said to me, "Hey Friend! Now that's what I like to see!" The first time this happened I thought it was coincidental but on the second occasion I realized that his use of the word "Friend" was meant to indicate to me that he was part of a clique with Anzalone, and that his intention was for other i/i's to hear him call me his "Friend" and be assaulted and beaten again. (In prison, an i/i who is a friend of an officer is known as a "rat" and subject to vigilante violence.) As a result of this behavior, I began to fear for my safety and I knew that Brown was conspiring with Reynolds and Anzalone to actively put me in situations in which I would be hurt or killed by other i/i's.

28. On or about March 11, 2021, I was again reassigned, this time to F2, a federally funded Residential Substance Abuse and Treatment ("RSAT") dorm.

29. After arriving on F2 that day, I was approached by an unidentified Black i/i who gave me a

-3-

handwritten note ("a kite") stating that he wanted to have sex with me. After I had read it, the i/i ordered me to destroy it because it was violative of the Prison Rape Elimination Act ("PREA"). I did not do so because I was afraid he wouldn't take "no" for an answer and wanted to have evidence if I needed it.

30. On or about March 12, 2021, just prior to the lunch chow run, the author of the kite approached me in the bathroom area and exposed his penis to me. I told him that I did not want anything to do with him and left the bathroom area. I immediately wrote a handwritten letter to Defendant Fenton in which I stated that I had been approached for sex, feared for my safety, and wanted to be moved out of F2. I gave him the letter, and the kite as evidence.

31. Approximately one hour later, Fenton told me that he had contacted movement and control and that I would be moved off of F2 that day.

32. No such move was made, and I remained on F2. The only plausible explanation for this is that Defendants Bennett and/or Fountain must have refused to approve my being moved from F2. Upon information and belief, this was because someone from the retaliation conspiracy group (¶7) had informed them of the retaliation effort and called in a favor with them with respect to me. When Fenton realized that I was not moved, his responsibility in the matter did not end. He should have contacted Lieutenant McGuire, who was a superior officer in charge of Housing. He did not do so.

33. On or about 10:05PM that same day, I was approached by i/i Johnson. He told me that I would be required to do the dishes and other cleaning chores of the Bloods because I was a "Rapo." I told him that I would do cleaning work for pay, but not for free. He stated that "niggas ain't tryna hear that." I walked away from him and entered the bathroom area. I went into the first stall (which had no door) and smoked a cigarette while chatting with another i/i of Puerto Rican descent. While I was smoking, Johnson attacked and savagely beat me in the head and upper body area. I was unable to defend myself and began bleeding profusely from the mouth and nose as a result of the attack. I did not realize it right away, but Johnson had broken my jaw.

34. After attacking me, Johnson left the bathroom. I was still bleeding a lot and tried to clean myself up. I then reported to F2 Officer Roles that I was injured and needed emergency medical assistance. Roles called a "Red Dot" emergency on the radio.

35. Defendant Reynolds arrived at F2 shortly thereafter with a security squad. He took me out into the dorm entry area and questioned me about who had attacked me. I started to explain to him that I did not know Johnson's name or cube number and that I wanted Reynolds to escort me back into the dorm so I could point out the i/i in question, but he cut me off before I could finish. He called me a liar and told me that they would just "bring [me] right back there to get [my] ass kicked again."

36. I was escorted to the infirmary by van. The officers in the van told me "if [I] wasn't so soft, [they would] beat [my] ass too." Upon arrival at the infirmary, I complained to a short, Black nurse that I thought my jaw was broken. She replied only, "well, let's hope not." She did not ask me any questions, examine me, or treat me for my injury in any way. I was photographed by

-4-

Reynolds before leaving.

37. Immediately after that, I was driven by van back to D1 by order of Reynolds. In the van, the officers told me they hoped that the i/i's in D1 would "cut my head off."

38. On or about March 14, 2021, at 8:10PM, Defendant Brown entered D1 accompanied by Reynolds and Deusler. Brown gave the order for Count.

39. After all the i/i's had returned to their cubes, were standing at the entries thereto, and were silent, Brown walked up to my cube. He stopped in front of me and faced towards me, and made the following speech in a loud voice so that everyone in the dorm could hear him: "Hi, Friend! How are you doing today? Great! Hey everybody, I want you all to know that my Friend here is really good at doing dishes! So, if any of you here need to have your dishes done, bring them to my Friend here because he's got that special Palmolive Hand!"

40. Most, if not all of the i/i's in D1 were present when I had previously been assaulted for refusing to do free dishes as "rapo penance." They knew from this speech very clearly that it was Brown's intent for them to hurt or kill me. After Brown, Reynolds, and Deusler left D1, Defendant Stockton exclaimed to me, "What the FUCK did you do to piss Brown off?!" He should have reported Brown's unlawful conduct. He should have reported that two Sergeants with Brown stood by and allowed it to happen. He did neither. Several i/i's made derogatory comments to me and stated that Brown must want them to "beat my ass."

41. On or about March 15, 2021 and in the morning, I was moved back to F2 just as Reynolds stated that I would be. Upon information and belief, no investigation was done to determine who my attacker was or if he still resided on F2. (He did.) I remained in my cube for the entire day because I was in fear for my life from Johnson. I was so scared, in fact, that I only went to the bathroom when I knew Johnson was gone. I did not go to meals for fear of being near him. I wrote letters to the disciplinary lieutenant and to Captain Valenzano pleading for help to protect my safety.

42. On or about March 16, 2021, I was called to meet with Lt. Schwebe and CO Edge. Both were very kind and understood what had been going on. They gave me the option of signing into Voluntary Protective Custody ("VPC") or moving to E2, a dorm they felt sure I would be safe in. I advised that I wanted to go to E2 because I trusted their opinion and did not want to have to live in PC unless it was absolutely necessary. I also told them that I had been putting in sick call slips because I believed my jaw was broken, and I told them who Johnson was by giving them his cube number and stated that I wanted to press charges against him for a hate crime if it turned out that my jaw was in fact broken.

43. Immediately after that meeting, I was moved to E2 where I successfully integrated into population without issue.

44. On or about March 18, 2021, I was seen at the infirmary and complained again of a broken jaw. The following day, I was transported to MidState CF and xrays were done. After returning to Marcy, the nurse told me that the xray showed a break and I would be scheduled to see an ENT doctor. I went back to my dorm, but then was immediately called back to medical. I was told that

the injury was too serious to wait to schedule an appointment and that I would be immediately brought to the emergency room. Upon going to the emergency room, I was told that I needed surgery. I returned to Marcy, and then on or about March 23, 2021, I was advised by medical that surgery had been scheduled in a "couple of days."

45. After returning to E2 from medical, I was called to the Sergeant's office by Defendant Fountain. On the way there while waiting to be pat-frisked, Defendant Anzalone asked me if everyone in E2 was leaving me alone. I replied that they were and I was fine. He stated to me "Well, we'll have to see what we can do to change that for you!" He laughed at me and left before I went into the Sergeant's room.

46. During the meeting with Fountain, Defendant Bennett was also present as was Sergeant Trombly. Fountain questioned me about the identity of my attacker in E2 after telling me that Lt. Schwebe had asked him to take a report from me for the purpose of pressing charges against Johnson. I made positive identification of Johnson and provided a statement about the attack. After that meeting, I was told to go back to E2 which I did. Immediately upon returning to E2, however, I was called right back to the Sergeant's office. When I got back, I was told that I was being admitted into Involuntary Protective Custody ("IPC"). I was handcuffed and escorted to the SHU by Trombly.

47. Thereafter, I resided in SHU until my first surgery and subsequent transfer out of Marcy. I filed the Grievance about these issues while there. I was interviewed for the Grievance by Deputy Superintendent for Security Snyder; I told him that everyone in D1 had witnessed Sergeant Brown's speech attempt to have me hurt or killed. Despite that, Snyder refused to interview any of them because I could not identify them by name.

48. Since that time, I have had two teeth removed and then a second surgery on my jaw as a result of Johnson's attack which was the result of Fenton's deliberate indifference.

### V. Statement of Constitutional Violations

All of the Defendants have committed Cruel and Unusual Punishments against me. Nick Anzalone began a campaign of retaliation against me for reporting his unlawful behavior to OSI. He engaged the other Defendants in a Conspiracy to retaliate and commit Cruel and Unusual Punishments against me by either directly attempting to have me hurt or killed, harassing and threatening me, or deliberately failing to protect me. This is evidenced, in part, by the consistent use of the word "Friend" between multiple Defendants. Defendant Deusler may have done the very least, but he still stood by (as did Reynolds) as Brown engaged in a speech directed towards a full dorm of i/i's with the intent to have me murdered and he did not report those actions. Reynolds, Brown, and Anzalone conspired together to keep tabs on the dangerous things that were happening to me and made intentional efforts to exacerbate them and also directly place me in situations in which I would be hurt or killed. Fenton was deliberately indifferent to my safety by failing to contact Housing Lieutenant McGuire when he realized that Fountain and Bennett were not going to move me. Even though the problem he was aware of was a sexual threat of rape, his deliberate indifference to that threat led directly to my enduring a brutal assault by a gang member which resulted in a

broken jaw. That injury caused me to need two surgeries in my jaw and lose two teeth in the process. While Bennett and Fountain may have only been "doing favors" for the retaliation conspiracy group (¶7), their actions - at the very least in refusing to move me from F2 - led directly to my injury. All of the Defendants caused me to experience intense psychological pain, fear for my life, have suicidal thoughts, and wish I was dead.

## VI. SUPPLEMENTAL STATE TORT CLAIMS

Negligence, Intentional Infliction of Emotional Pain, Harassment, Libel, and Defamation of Character against all Defendants whom these would apply to. Would the Court allow me to do so, I would also use this action to prosecute i/i's Reed, Milord, and Johnson for the State Torts of Assault and Battery leading to serious injury.

## VII. Relief Requested

Declaratory Relief: I seek a decree that the rights to Equal Protection of Law, to be free from Cruel and Unusual Punishment, the New York State Constitutional Right to a Healthful Environment, the State Corrections Law regarding the Right to be free from Degrading Living Conditions, and any other applicable Constitutional right, or state or federal law, in totality, create the absolute right for i/i's who are convicted of SORA offenses or are LGBTQi+ to be housed separately, upon indication of their desire for such, than general population withOUT enduring the excruciating hardships associated with Protective Custody. We are due the same considerations and privileges as "general convictees" in addition to a heightened level of protection and care due to our charges, sexual orientation, or both.

Injunctive Relief: Terminating and barring from employment all of the Defendants via Dishonorable Discharge, and forfeiting any state pension to go towards the cost of implementing the declaratory relief sought. An order forcing DOCCS to implement an opt-in living situation as described in the declaratory relief for all SORA-convicted and LGBTQi+ i/i's, as their default and de facto placement immediately upon entering DOCCS custody. This includes deferring anyone who fits that description from standard "reception" procedures directly there. The only exception is if they choose to opt-out which may be done after the initial placement therein through the local housing lieutenants. This is to be done at all facilities - medium, max, and women's.

Compensatory Damages: $2,500,000.00 (Two and half million dollars) against all defendants, in total.

Punitive Damages: $250,000.00 each against Nick Anzalone and Mr. Brown for a total of $500,000.00.

The total monetary relief sought is thus three million dollars.

The foregoing requested relief is for the purpose of making me whole from a physical and psychological perspective. It is also to shock the State of New York into realizing that these practices must stop. Finally, it is to prevent and deter any similarly heinous acts from happening to ANY incarcerated person ever again.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE EXCEPT AS TO MATTERS STATED TO BE TRUE UPON INFORMATION AND BELIEF AND AS TO THOSE MATTERS, I BELIEVE THEM TO BE TRUE.

DATED: 6/23/22

*[signature]*

Michael Anderson Balentine

Plaintiff, Pro Se

28 U.S.C. §1746